IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ROSALIND GRAY | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 08-00057-CV-W-NKL-SSA |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | |

O R D E R

Plaintiff Rosalind D. Gray ("Gray") challenges the Social Security Commissioner's ("Commissioner") denial of her application for disability and disability insurance benefits under Titles II and XVI of the Social Security Act, as amended. Gray has exhausted her administrative remedies, and jurisdiction is conferred on this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Gray argues that the record does not support the ALJ's finding that she was not under a disability because the ALJ: (1) erred in determining Gray's residual functional capacity; (2) erroneously relied on the opinions of non-examining agency medical experts; (3) failed to adequately develop the administrative record; and (4) erred in determining that Gray could perform her past relevant work. The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent

1

necessary.[1]  Because the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole, the Court denies Gray's Petition.

I.    **Factual and Procedural History**

  A.    **Gray's Testimony**

At a hearing before the ALJ on August 9, 2007, Gray testified that she was 47 years of age, had graduated high school and had one year of computer training. She told the ALJ that she had first been diagnosed with multiple sclerosis ("MS") in 2001, and had last had an MRI in late 2004. She stated that she had sharp pains in her head and occasional vision problems related to MS, and that she saw her doctor regarding her MS every three months.

With respect to her vision problems, Gray indicated that her vision impairment was worse in her left eye, and that such problems occurred an average of two times per week and lasted around three hours. She described the impairment as a dimming or cloudiness. Gray said she avoided driving three or four days a week on average because of her vision loss. Gray described her pain as a "sharp pain" from the top of her head to the middle of her spine. She said that the pain occurred every other day and lasted from thirty minutes to an hour. She also testified that she experienced numbness in her hands and feet daily, which occasionally caused her to lose control of her hands and drop items, and said she experienced tremors in her right hand when holding and reading a newspaper. She described a burning feeling in her toes and a stinging feeling in her fingers. Gray indicated she could only lift

---

[1] Portions of the parties' briefs are adopted without quotation designated.

2

and carry objects weighing five pounds about 15 or 20 feet before dropping them due to weakness or pain in her hands. She told the ALJ that, on a scale of 1 to 10 with 10 being the highest level of pain, she rated the pain in her fingers at 6 or 7, the pain in her feet at 9, and the pain in her head at about 9.

Gray testified that she had problems with numbness, balance, and weakness in her legs. She indicated that at times, upon standing, her legs would feel weak and she would lose her balance. She testified that she could only stand when using a cane for support, and even then only for about 15 to 20 minutes before she had to sit down due to pain or weakness in her legs. She further stated that she could walk on a level surface using her cane for about a block before she had to stop to rest, and that she could only climb ten steps before stopping to rest due to pain or discomfort. Gray testified that she could only sit comfortably for about 30 minutes before experiencing numbness in her legs.

Gray told the ALJ that she had problems with incontinence an average of two times a week.

Gray further testified that her illness had caused cognitive and psychological problems. Specifically, she stated that she has difficulty remembering where she has left things, that she has trouble with calculations, and that she is no longer able to help her son with his homework. Gray told the ALJ that she had been depressed since she was diagnosed with MS, and that she was "just down all the time."

Gray told the ALJ that she had been prescribed: Copaxone, a muscle relaxer; Tramadol, a pain medication; Amitripylene, an anti-depressant; and Baclofen, another muscle

3

relaxer. At the time of the hearing, Gray had ceased taking Amitryiptylene and said she took Copaxone only infrequently due to its cost. She said she had taken Ibuprofen 800s in the past but that this medication had stopped working for her. Gray indicated that the courses of pain medications and muscle relaxers her physician had prescribed her had begun to relieve her pain. She told the ALJ that her medications caused "a little dizziness and drowsiness," and that her pain medication had caused her to fall asleep at times. Gray stated that she used a brace on her right hand at night because her hands "draw up every night." She indicated that her pain medication caused her to need sleep for two to three hours.

Gray also testified as to the impact of her lifestyle. She stated that she performed light housework, but that she needed to stop to rest after about 15 minutes for about 30 minutes. She testified that she is not able to stand over the stove, and that as a result she now has to buy easier to prepare meals or rely on her sister or friends to cook for her. She testified that she could no longer perform household chores such as washing clothes, ironing, washing dishes, or cleaning bathrooms because of her illness. Gray stated that her son had to accompany her to the grocery store because she was unable to push her shopping cart around the store. She further stated that she has stopped attending her church or going out with friends because of her MS.

### B. Medical Treatment History of Gloria E. Carter

Gray first began experiencing symptoms consistent with MS in 2001. In November of 2004, her symptoms began to get worse. She experienced a loss of vision in her left eye and, later, in her right eye. She consulted her doctor, Dr. Michael Dahl, M.D., who suspected

4

optic neuritis, a symptom of MS. Dr. Dahl in turn referred her to a neurologist, Dr. Iftekhar Ahmed, M.D., for further evaluation.

After Gray described the symptoms she was experiencing to Dr. Ahmed, he advised her that he too suspected MS. Dr. Ahmed noted that Gray's vision had improved after a temporary loss of vision in her right eye. Dr. Ahmed stated that Gray denied any bowel or bladder dysfunction and any balance difficulties. He advised Gray that he wanted to do further testing in the form of an MRI of the brain and a spinal tap (lumbar puncture). Gray declined the spinal tap but did agree to submit to an MRI of her brain. The MRI confirmed MS.

Vision testing reports from February 2005 referred to Gray's optical problems as "resolved."

Gray was treated at Kansas University Medical Center beginning in August 2005. She was treated for a spider bite in February 2006, and complained of numbness in her face. Medical records note Gray had normal muscle strength. Gray complained of difficulty with mobility in June 2006. Physical examination showed that she retained full strength or nearly full strength and mild ataxia. Doctors recommended treatment with prednisone.

### C. Vocational Expert Testimony

Dan Zumwalt, a vocational expert ("VE") also testified before the ALJ. The VE, having reviewed the vocational record in Gray's case, testified that her past work fell into the categories of: general clerk, a semi-skilled position at the light exertional level; stockman,

5

a semi-skilled position at the heavy exertional level; receptionist, a semi-skilled position at the sedentary exertional level; and accounting clerk, a skilled position at the sedentary exertional level. The ALJ then asked the VE, assuming a hypothetical person of Gray's age, education, and work history, and assuming that such person was limited to light exertional work and could only stand or walk a total of three hours in an eight hour day, whether that person could perform any of Gray's past work. The VE indicated that such a person would be able to work as a receptionist or an accounting clerk.

The ALJ then asked the VE to consider whether such a hypothetical person would be able to perform any of Gray's past work if such person had no to occasional difficulties either with fine manipulation or handling. The VE testified that this additional restriction would preclude performing any of Gray's past work. The ALJ then asked the VE whether or not there would be *any* work available to the hypothetical person with these additional restrictions. The VE stated that such a person could work in a sedentary, unskilled position such as a surveillance system monitor, a callout operator, or a telephone quotation clerk.

The VE responded to a number of variations on the above hypotheticals. He testified that if the hypothetical person missed two days of work per month on average, they would likely not be able to sustain employment at an entry-level position. He testified that the additional restriction of needing to take hour-long breaks during the workday would preclude all competitive employment unless that hour of break-time could be taken at regularly scheduled times. In response to a question by Gray's counsel, the VE testified that if the hypothetical person was required to sustain only limited activity from eight o'clock until

6

noon, and needed to take a two- to three-hour break in the afternoon, such person would not be able to sustain competitive employment.

## II. Discussion

In reviewing the Commissioner's denial of benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

The Commissioner's regulations governing determinations of disability establish a five-step sequential evaluation process which ALJs must use in assessing disability claims. *See* 20 C.F.R. §§ 404.1520; 416.920 (2008). In the first three steps of the process, the Commissioner determines whether the claimant is engaged in substantial gainful activity, whether he or she has a medically determinable impairment that is "severe" under the meaning of the Act, and whether the claimant suffers from an impairment that meets or equals any impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1. *Id.* At step four, a claimant must establish that he or she is not able to return to his or her past relevant work.

7

*Id. See also, e.g.*, *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). If the claimant establishes that he or she is unable to return to past relevant work, the burden shifts to the Commissioner to show that the claimant can perform work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520; 416.920 (2007). The Commissioner may meet this step five burden by relying on the medical-vocational guidelines (guidelines) or on VE testimony.

### A. The ALJ's Decision

In this case, in the first two steps of the sequential evaluation process, the ALJ found that Gray had not engaged in substantial gainful activity during the period she alleged she was disabled, and that she had a severe impairment under the meaning of the Act: multiple sclerosis with associated optic neuritis. At step three, the ALJ found that Gray's impairments did not meet or equal any impairment found in the "Listings" at 20 C.F.R. pt. 404, supt. P., app. 1. The ALJ evaluated Gray's subjective allegations in light of the record as a whole and concluded Gray was not fully credible. She found Gray was limited to walking or standing no more than three hours in an eight-hour workday, but nevertheless concluded that Gray retained the residual functional capacity for sedentary to light work. Based on Gray's residual functional capacity and the testimony of the VE, the ALJ determined Gray retained the ability to perform her past relevant work as a receptionist or accounting clerk, and therefore was not disabled.

8

The ALJ then engaged in an alternative step five analysis and made an alternative residual functional capacity finding, adding to her previous residual functional capacity formulation that Gray would have occasional difficulties with fine manipulation and handling. While the ALJ found that Gray would be unable to perform her past relevant work given these additional restrictions, she concluded, based on VE testimony, that Gray could perform other work found in significant numbers in the national economy, such as a surveillance systems monitor, call-out operator, or telephone quotation clerk. The ALJ therefore found that Gray was not disabled.

### B.     The ALJ's Residual Functional Capacity Determination

Gray argues the ALJ did not apply the correct legal standard in assessing her residual functional capacity, in that the ALJ's residual functional capacity determination was not based on medical evidence. The ALJ's decision reflects that she carefully considered Gray's credibility, noted relevant psychological examinations, and considered Gray's course of treatment for MS.

Gray had the burden to come forward with relevant evidence of her restrictions. The Commissioner's regulations state that it is the claimant's responsibility to provide medical evidence to show that he or she is disabled. *See* 20 C.F.R. §§ 404.1512, 416.912 (2008); *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). Gray is correct in noting that ALJs have a duty to develop the record fully and fairly. *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993). Even so, an ALJ is not required to function as substitute counsel and only needs

9

to develop a reasonably complete record. *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994).

Further, the Eighth Circuit has recognized that residual functional capacity is a determination based upon *all* the record evidence, not just "medical" evidence in the sense meant by Gray. *See Pearsall v. Massanari*, 274 F.3d 1211, 1217-18 (8th Cir. 2001); *Dykes v. Apfel*, 223 F.3d 865, 866-67 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545; SSR 96-8p at pp. 8-9). The residual functional capacity formulation is a part of the medical portion of a disability adjudication. Although it is a medical question, the residual functional capacity findings are not based only on "medical" evidence, *i.e.*, evidence from medical reports or sources; rather an ALJ has the duty, at step four, to formulate residual functional capacity based on all the relevant, credible evidence of record. *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); *Dykes*, 223 F.3d at 866-67 (RFC is a determination based upon all the record evidence but the record must include some medical evidence that supports the RFC finding). *See also* 20 C.F.R. § 416.945; SSR 96-8p. An ALJ's residual functional capacity determination is based upon *all* of the credible evidence of record and the ALJ's evaluation of that evidence; the ALJ need not base his or her determination *solely* on the opinions of doctors or other treating sources. Here, the ALJ properly considered all the evidence of record in analyzing Gray's credibility, and then

10

properly considered all of the evidence of Gray's restrictions found to be credible in determining Gray's residual functional capacity.

Gray makes no direct argument regarding the majority of the ALJ's assessment. The ALJ acknowledged that Gray suffered from MS, but carefully assessed the degree to which the disease limited Gray during the relevant period. She acknowledged that medical evidence suggested that Gray's vision was affected by the disease, but observed that Gray continued to hold a driver's license, and that there was little objective evidence of a consistent or lasting decline in her vision. Indeed, reports from Dr. Ahmed noted that Gray's vision had improved and testing reports from February 2005 referred to her optical problems as "resolved." The ALJ further noted that Gray had complained of extreme incontinence at her hearing, but considered that her medical records did not reveal consistent or MS-related complaints of such problems. Gray specifically denied incontinence to Dr. Ahmed.

The ALJ noted that physical examinations of Gray had revealed "minimal findings." Again, shortly prior to her diagnosis with MS, Dr. Ahmed noted that Gray's loss of vision had improved, that she did not have any aphasic difficulties, and that Gray's upper and lower extremities were normal. In December 2004, Dr. Ahmed noted abnormalities in Gray's testing, and that she had "mild ataxia," or a mild lack of coordination. Gray refused further diagnostic measures and prednisone treatments Dr. Ahmed recommended. Dr. Dahl made note only of mild difficulties in Gray's back and upper neck, but found that Gray's sensation and strength were normal.

11

Treatment at Kansas University Medical Center beginning in August 2005 revealed only minor difficulties. Records from February 2006 indicate Gray had normal muscle strength. As the ALJ acknowledged, Gray did complain of difficulty with mobility in June 2006. However, physical examination still showed that she retained full strength or nearly full strength and only "mild" ataxia.

As the ALJ pointed out, there was no further evidence provided by Gray suggesting that she had continued to decline thereafter. Indeed, this KU medical report was the last one provided before the ALJ issued her decision, more than a year later. *See Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001) ( the fact that a plaintiff had not sought treatment from any physicians in the seven months prior to the administrative hearing was legitimate factor in discounting plaintiff's subjective complaints).

The ALJ noted that Gray's testimony of an extremely restricted lifestyle appeared to conflict with earlier statements in which she indicated that she cared for herself and her child and handled routine house chores. The ALJ added that Gray had testified that her condition had declined, which would have accounted for his discrepancy, but that her medical reports did not document any deterioration in her condition sufficient to cause the extreme limitations she alleged during her hearing.

Gray does not directly dispute the ALJ's assessment of the relevant medical evidence, nor does she make a significant effort to point to evidence that weighs against the ALJ's conclusions. The ALJ carefully considered all of the relevant medical evidence before assessing Gray's residual functional capacity, and her residual functional capacity

determination was based upon the credible evidence in the record and her evaluation of that evidence.

### C. Weight Given to Non-Treating Sources

Gray argues the ALJ erroneously relied on the opinions of non-examining agency medical experts in determining Gray's residual functional capacity. She points out that the ALJ appears to have relied on a non-physician expert, Jennifer McGunnes ("McGunnes"). Gray contends that the ALJ based her residual functional capacity on Ms. Gunnes "projected" residual functional capacity, one she says is based on a forecast of what Gray's capacity would be in 12 months.

The ALJ did not assign inappropriate weight to McGunnes's opinion. The ALJ cited both McGunnes's opinion and the opinion of a qualified psychologist, Keith Allen, Ph.D., collectively as "non-examining State agency medical personnel and program psychologist," whose opinions were "generally consistent" with the remainder of the other medical evidence. The ALJ's decision does not suggest she mistook Ms. McGunnes to be a physician, as she referred to her not as a doctor but as "medical personnel." Furthermore, Social Security rulings specifically required the ALJ to consider non-examining source opinions as part of her decision making process. Social Security Ruling 96-6p instructs ALJs to carefully consider the opinions of such experts because they are usually familiar with relevant medical issues and highly familiar with the Social Security regulations and rulings. *See* SSR 96-6p. Consistent with SSR 96-6p, the ALJ specifically indicated that she had

13

assigned some weight to McGunnes's opinion because it was consistent with other evidence in the record, including evidence from acceptable examining medical sources.

### D. Development of the Record

Gray next argues that the ALJ failed to fully develop the record. Gray contends that the there was no medical evidence about how her impairments affected her during the relevant period, and that the ALJ should therefore have obtained further medical professional opinions regarding the mental and physical aspects of her residual functional capacity. While the ALJ had a duty to develop the record fully and fairly, it was incumbent on Gray to provide evidence. *See Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) *and* 20 C.F.R. §§ 404.1512; 416.912 (2008). The ALJ is not required to develop further evidence in every case, but only if gaps in the record render her unable to make a decision. *See Tellez v. Barnhart*, 403 F.3d 953, 956-57 (8th Cir. 2005) ("Tellez contends that the ALJ did not 'fully and fairly develop the record' concerning her limitations and that if the 'ALJ did not believe that the professional opinions available . . . were sufficient to allow him to form an opinion, he should have further developed the record.' However, there is no indication that the ALJ felt unable to make the assessment he did and his conclusion is supported by substantial evidence."). "[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995) (quoting *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994)).

14

Furthermore, even assuming the ALJ had not fully developed the record, Gray would have to demonstrate that she was prejudiced by the ALJ's error. *See Onstad*, 999 F.2d at 1234; *Combs v. Astrue*, 2007 WL 2174555 (8th Cir., July 30, 2007) (unpublished) (the plaintiff "bears a heavy burden in showing the record has been inadequately developed"). Gray has not demonstrated that she was prejudiced by any gaps in the record or lack of development, as she fails to cite anything suggesting the ALJ did not already have all of the information available given her relatively light treatment. Gray has not produced any further information suggesting that the ALJ's failure to obtain further medical evidence prejudiced her. *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("Without informing the court what additional medical evidence should be obtained from Dr. Johnson, Ellis has failed to establish that the ALJ's alleged failure to fully develop the record resulted in prejudice, and has therefore provided no basis for remanding for additional evidence."). Gray was not prejudiced by the ALJ's failure to consider medical evidence that may not even exist.

### E.     The ALJ's Step Four Determination

Finally, Gray argues that the ALJ did not sufficiently investigate the demands of her past relevant work before finding at step four of the sequential evaluation process that her residual functional capacity permitted her to return to that work. The VE testimony supports the ALJ's step four finding. At Gray's hearing, the VE testified as to Gray's past work and classified it as to skill-level and exertional requirements. The VE described Gray's past relevant work as a general clerk, stockman, receptionist, and accounting clerk. Asked by the

15

ALJ whether any of those jobs would still be available given Gray's residual functional capacity, the VE testified that Gray would retain the ability to perform work as a receptionist and an accounting clerk.

It was appropriate for the ALJ to rely on VE testimony in making such her step four determination. Social Security rules clarify that an ALJ may rely on a vocational expert's analysis to compare the demands of a claimant's past relevant work with their residual functional capacity:

> In addition, a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

20 C.F.R. §§ 404.1560(b)(2); 416.960(b)(2) (2008). The ALJ relied on the VE's testimony in determining that Gray could return to her past relevant work.

Gray cites *Groeper v. Sullivan*, 932 F.2d 1234 (8th Cir. 1991), for the proposition that the ALJ had an obligation to "fully investigate and make explicit findings as to the physical and mental demands of [Gray's] past relevant work and to compare that with what [Gray] is capable of doing" before determining whether she was capable of performing her past relevant work. Pl.'s Social Security Br. 24. In *Groeper*, the ALJ did not have the benefit of VE testimony, and the Eighth Circuit found the ALJ's determination that the claimant was capable of performing his past relevant work was conclusory. *Id.* at 1238–39. Here, the ALJ's determination was not conclusory; it was based her decision on VE testimony.

Furthermore, the ALJ made an alternate step-five finding in this case. The ALJ found that, even if Gray were unable to perform her past sedentary work, she could perform other work in the national economy, such as a surveillance systems monitor or as a call-out operator. In order to satisfy the Commissioner's burden of proof at step five, the ALJ was entitled to rely upon the testimony of a VE that Gray was capable of performing jobs that existed in the national economy in significant numbers if the ALJ first asked the VE to consider impairments suffered by Gray that were substantially supported by the record as a whole. *See Grant v. Apfel*, 17 F. Supp. 2d 975, 983 (D. Neb. 1998). Thus, even if the ALJ's findings with regard to Gray's ability to perform her past relevant work at step four were deficient, the ALJ went on to determine at step five that Gray was not disabled, and that determination was supported by substantial evidence.

MS is a terrible disease with no known cure, and Plaintiff has no doubt suffered both as a result of the disease as well as the stress and fear that justifiably result from such a daunting diagnosis. That being said, MS progresses differently in different patients,[2] and the Commissioner's determination that Gray, during the relevant time period, was capable of performing work in the national economy was supported by substantial evidence on the record as a whole.

---

[2]According to the National Multiple Sclerosis Society website, "[i]t is very difficult to predict the course of MS . . . [and] the diorder varies greatly from one individual to another[.]" National Multiple Sclerosis Society web site, *Living with MS: Living with Advanced MS: Prognosis*, *at* http://nationalmssociety.org/living-with-multiple-sclerosis/living-with-advanced-ms/prognosis/index.aspx (last visited Oct. 2, 2008).

17

III.    Conclusion

Accordingly, it is hereby

ORDERED that Gray's Petition [Docs. ## 6, 13] is DENIED.

                                                  s/ NANETTE K. LAUGHREY
                                                  NANETTE K. LAUGHREY
                                                  United States District Judge

Dated: October 28, 2008
Jefferson City, Missouri